## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**BARBARA VERES**                                        :
3413 Pocahontas Drive                                    :
Edgewater, MD  21037                                     :
                                                         :
      Plaintiff,           :   **Civil Action No.:**
                                                         :   (Jury Trial Demanded)
v.                                                       :
                                                         :
**KEVIN K. MCALEENAN,**                                  :
**ACTING SECRETARY, UNITED**                             :
**STATES DEPARTMENT OF**                                 :
**HOMELAND SECURITY**                                    :
Washington, D.C.  20528                                  :
                                                         :
      Defendant.           :
_____:

### COMPLAINT

Plaintiff, Barbara Veres ("Ms. Veres" or "Plaintiff"), by and through her undersigned

counsel, hereby brings this Complaint against Kevin K. McAleenan, Acting Secretary of the

United States Department of Homeland Security ("DHS," "Defendant," or "Agency"), by

averring and asserting as follows:

### INTRODUCTION

1.      The present lawsuit is brought by Ms. Veres, a Contract Specialist formerly

employed by DHS, most recently in the Office of Procurement Operations ("OPO").

2.      Ms. Veres' claims of gender, race, age discrimination and a hostile work

environment in federal employment are brought pursuant to Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. §2000e *et seq*., 42 U.S.C. §2000e- 16(c) (collectively referred to as

"Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. §633a, *et seq.*, as

amended ("ADEA"), and 29 C.F.R. §1614.407, which permits a federal employee such as Ms.

Veres to file suit in federal court against the head of a federal governmental agency to address

discrimination in the terms and conditions of employment.

3.      Ms. Veres, a 61 year old, female, Caucasian/White former employee seeks

declaratory and equitable relief; damages of back pay and front pay; compensatory damages, and

attorney fees and costs.

4.      The claims, supporting facts and damages set forth in this action are referred to

individually or, at times, collectively as the "Lawsuit."

## PARTIES

5.      Ms. Veres is an adult resident of the State of Maryland, residing at 3413

Pocahontas Dr., Edgewater, MD 21037. At all times relevant to this Lawsuit, Ms. Veres was

employed by Defendant and was an "employee" within the meaning of Title VII, the ADEA and

the implementing regulations of these statutes.

6.      Defendant, Kevin K. McAleenan, Acting Secretary, DHS, is an "employer" and

agency or Department head within the meaning of Title VII and the ADEA, and who at all times

relevant to this Lawsuit employed at least fifteen or more employees.  At all times relevant to

this Lawsuit, the actors and individuals identified herein were employees of DHS acting within

the scope and course of their employment and authority.

## JURISDICTION AND VENUE

7.      Jurisdiction of this matter arises under 28 U.S.C. §1331 with a federal question

involving Title VII and the ADEA.

8.      Venue is proper in the United States District Court for the District of Columbia

under 28 U.S.C. §1391(b) and 42 U.S.C. §2000e-5(f)(3), as the employment practices alleged to

be unlawful were committed within the jurisdiction and the DHS operates and maintains its

Office of Procurement Operations ("OPO") at 7th and D Street, SW, in the District of Columbia, where Ms. Veres was previously assigned and which is within this District.

### ADMINISTRATIVE UNDERTAKINGS

9.      On or about October 29, 2015, Ms. Veres timely contacted the Agency's Office of Civil Rights and Civil Liberties ("Agency EEO Office") to commence the informal EEO process to complain of discrimination on the bases of gender, race and age.

10.     After finishing the informal EEO process, on or about December 12, 2015, Ms. Veres filed a timely formal EEO complaint.

11.     On June 14, 2106, Ohkee Shim ("Ms. Shim"), the Agency's Acting Formal Complaints Manager sent an election letter to Ms. Veres, and specifically informed her that she had to elect one of three options by July 1, 2016, those being (i) request an EEOC hearing; (ii) seek final agency decision; or (iii) withdraw her complaint.

12.     On June 22, 2016, Ms. Veres emailed Ms. Shim asking if there was a way in which she could delay her decision until July 15, 2016 insofar as she was leaving the country and attempting to sell her home.  In an ongoing email string, Ms. Shim indicated that she did not have the authority to extend the decision date, and pointedly asked "do you intend to request a hearing with the EEOC….?"  Ms. Shim's email concludes "Please let me know today, if possible."

13.     On the same day, as requested, Ms. Veres later replied to Ms. Shim that she "[W]ould like to move forward. Could you forward to the Agency for me?" In response, Ms. Shim responded "Sure, will do."

14.     Having heard nothing from the Agency for nearly five months, Ms. Veres forwarded an email on or about November 12, 2016 and again on February 18, 2017 inquiring of

the status of her case and reiterating her understanding that her request for a hearing was being processed.

15.     Four days later, on or about February 22, 2017, the Director of the Agency EEO Office explicitly confirmed to Ms. Veres that her case was at the hearing stage.

16.     Approximately nine months later, on or about November 17, 2017, Ms. Veres contacted the EEOC about the status of her matter and was informed by the EEOC's attorney-of-the day that there was no record of her case being at the hearing stage.  Ms. Veres was instructed to contact the Agency and request the paperwork that Ms. Shim represented she had submitted.

17.     Thereafter, as instructed, Ms. Veres contacted Denise Moore ("Ms. Moore") of the Agency's EEO Office to request a copy of the paperwork indicating her case had been processed for hearing.

18.     In response, on November 17, 2017, Ms. Moore emailed Ms. Veres and indicated that a final agency decision had been issued months earlier in March of 2017, and that "there is no further action required by this office."

19.     Insofar as Ms. Veres had at best been repeatedly misled, and at worst, intentionally lied to by Ms. Shim and members of the Agency's EEO Office regarding her request for hearing, she thereafter filed an appeal to EEOC's Office of Federal Operations ("OFO")(Appeal No. 0120180477).

20.     By decision dated May 2, 2019, OFO granted Ms. Veres' appeal and specifically found that the Agency led Ms. Veres to believe that she had properly requested a hearing and failed to process her requests.  OFO ordered the Agency to process Ms. Veres' request for hearing and other remedial relief.

4

21.     Despite this ruling, the Agency has since failed to follow and comply with the

dictates of OFO's Order.  As a result, Ms. Veres is electing, with the filing of this Lawsuit, to

initial a civil action in this Court.

22.     All conditions precedent and necessary to file this Lawsuit have been met and this

action is timely filed.

## FACTS

### Employment and Hierarchy

23.     Ms. Veres is a former career employee at DHS who most recently worked for

DHS within the Office of Procurement Operations ("OPO") in various branches and divisions

until her retirement from federal service in or around December of 2015.

24.     Ms. Veres was assigned to the Policies and Procedures Branch ("PPB") in the

Acquisition and Support Division of OPO in 2011 and 2012.  During this time, her first line

supervisor was Ronald Chrismer ("Mr. Chrismer")(Caucasian; male; approx 55 years old).

25.     In or around November of 2012, Ms. Veres was assigned to the Strategic

Development Administration Branch ("SDAB") within the Contract Management Division

("CMD") as a Contract Specialist and/or Supervisory Contract Specialist.  Mr. Chrismer then

became her second line supervisor and served as Director of CMD.

26.     At relevant times during this Lawsuit, Ms. Veres's first line supervisor at CMD

was Janice Brinkley ("Ms. Brinkley")(African American; female; approx 56 years old).  Ms.

Brinkley was Associate Director of CMD from approximately 2013 through 2016.

### Culture at CMD

27.     The workplace environment at OPO has been dominated by white males and, as

such, has fostered a culture that perpetuates negative stereotypes against women, particularly

elder Caucasian women. In such an atmosphere, elderly Caucasian women are often disparately treated, harassed, seen as inferior and are otherwise subjected to unwelcome treatment based on gender, age and race.

28.     During her employment within CMD, Ms. Veres experienced systemic abuse and ongoing mistreatment at the hands of Mr. Chrismer and others. This was reflected in daily communications, body language, the issuance of improper performance ratings, and, ultimately, purposeful assignment to a branch not suitable for her background, skills and qualifications, which in turn harmed her career ladder and forced her into an early retirement.

29.     Throughout her employment within the CMD, Ms. Veres was often demeaned, blamed for poor work of others, had her concerns minimized or ignored, and experienced greater vigilance of her work.

Transformation Contract Work

30.     Throughout 2014, Ms. Veres was heavily involved in performing contract administration duties on the "Transformation" contract, in addition to her other assigned responsibilities.

31.     Historically, the Transformation contract required two separate employees to fully service and perform. Prior to Ms. Veres, these responsibilities were handled by two male DHS employees.

32.     Ms. Veres, however, was expected to perform the duties of three employees by herself, and was given no meaningful support in this role. In addition, Ms. Veres was tasked with performing an assortment of other responsibilities, including reviewing work of other subordinates, training subordinate staff, assigning incoming requirements, redoing work prepared

by others and being involved with a very labor intensive cost line items analysis under the

Transformation contract.

33.    Ms. Brinkley, who at the time served as a first line supervisor, stated during the

mid-year performance that Ms. Veres was performing the work of several employees, and had

been tasked with all this work by Mr. Chrismer.

34.    Ms. Veres successfully saved over 3.5 million dollars in funds as a result of her

exceptional performance.

35.    In or around October of 2014, Ms. Veres received a performance rating of

"Exceeded Expectations."  The rating was lower than the "Achieved Excellence" rating she had

received the prior year.

Assignment to the Closeout Branch

36.    During a meeting, in or around October of 2014, Ms. Veres was castigated,

belittled and yelled at by both Ms. Brinkley and Mr. Chrismer for a co-workers inadequate

performance.  This co-worker is African American.

37.    This particularly task had been approved by Ms. Brinkley.

38.    This incorrect, false and malicious accusation was relied on to lower Ms. Veres'

performance rating and was used as a vehicle to reassign Ms. Veres from the SDAB to the CCB

– which internally was referred to the Closeout Branch or Closeout Unit.

39.    Assignment to the Closeout Branch is seen and understood throughout the CMD

as an express punishment of sorts and cause for humiliation.

40.    Poor performing employees are often transferred to the Closeout Unit because it

was known as the place to send an employee who could not make it anywhere else in

procurement.  It is a less prestigious, less visible unit and one in which career advancement is stunted.

41.     Ms. Brinkley had previously informed Ms. Veres she was considering sending a co-worker to the Closeout Branch due to poor performance.  However, Ms. Brinkely did not send the co-worker, who was African-American, to the Closeout Branch, instead opting to protect her career.

42.     When Ms. Veres pointed out to Ms. Brinkley that the reason she was being targeted and moved to the Closeout Unit was based on false information that Ms. Brinkley had reported—she ordered Ms. Veres "to get out of her branch," or words to that effect.

43.     Ms. Veres' assignment to the Closeout Branch was made effective November 1, 2014.

44.      However, upon information and belief, the decision to move Ms. Veres to this unit had been pre-planned for some time.  A co-worker of Ms. Veres, in fact, had relayed a rumor that Ms. Veres was going to be sent to the Closeout Unit.

45.     When Ms. Veres confronted Mr. Chrismer with allegations that the move was pre-planned, he was forced to admit was true.  Mr. Chrismer stated that a meeting had previously taken place with management wherein the decision was made to move Ms. Veres.

46.     Ms. Veres, however, was never offered to attend this meeting or given any chance to present evidence demonstrating that the alleged performance reasons being advanced for her reassignment were false.

47.     Prior to her involuntary assignment to the Closeout Unit, Ms. Veres had never been given any indication that her performance was subpar in any way.  To the contrary, her performance was excellent.

48.     Mr. Chrismer and others knew that Ms. Veres was eligible for retirement and buy-out, and fully expected that the punitive transfer to the Closeout Unit would finally push her out altogether.

49.     Upon information and belief, the career of the African American employee who made serious errors on the LSJ was not counseled, disciplined, transferred or punished by being reassigned to the Closeout Unit.  In other words, her career was protected while Ms. Veres' career was not.

Denial of Requests to Transfer

50.     In the ensuing months, Ms. Veres made multiple requests to be transferred out of the Closeout Branch to other positions within OPO that were more suitable for a senior acquisition specialist with more than 35 years of procurement experience.

51.     For example, during , there was an opening within the ITAC Division and it was made known to Ms. Veres that she would be most welcome to transfer and work in that position if Mr. Chrismer would approve the request.

52.     Mr. Chrismer, however, denied these and other requests for transfer out of the Closeout Unit, often saying that he could not move her because of "need."

53.     However, upon information and belief, similarly situated African-Americans and/or white males were permitted transfer or reassignment out of the Closeout Unit in 2015 and beyond.

54.     While assigned to the Closeout Unit, Ms. Veres continued to be demeaned, harassed and the victim of disparate treatment.

55. For example, in February of 2015, Ms. Veres was belittled and counseled for not agreeing with incorrect numbers provided by a male counter-part. It was not until this co-worker later admitted his mistake that she was somewhat exonerated.

56. On numerous other occasions, Ms. Veres was blamed for closeout numbers not being higher, when in fact it was a direct result of continually having closeout work be assigned and then taken away from her.

57. Upon information and belief, however, similarly situated African Americans and white males were not blamed or treated in this fashion.

<u>Declining Performance Rating 2015</u>

58. In or around October of 2015, the annual performance rating process was underway for the prior year.

59. Contrary to Agency practices and policies, Ms. Veres was not asked to submit a self-assessment of her own performance during this rating period. Instead, she was told that the ratings were already prepared and approved by OPO.

60. On or about October 27, 2015, Ms. Veres received a numerical performance rating of 3.48 which equated to "Achieved Expectations," but was just one level removed from the rating of "Unacceptable."

61. Kathy Wilson ("Ms. Wilson"), the Associate Director of the Closeout Unit began to cry while administering the performance rating to Ms. Veres, as if to indicate that she did not agree with the rating. Ms. Wilson further indicated that she asked Ms. Chrismer if the rating could be changed, to which he curtly replied "No."

62. This negative rating harmed her career ladder, and represented what was a discriminatory continued decline of her ratings while at CMD.

Constructive (Forced) Retirement

63.     By the end of 2015, the cumulative stress of the hostile working environment and mistreatment was causing Ms. Veres to experiencing increasing anxiety, depression and emotional instability due to the harassing and discriminatory treatment and general lack of support.

64.     Insofar as she had been effectively condemned to the Closeout Unit in perpetuity and seeing no path for further career advancement, Ms. Veres was constructively forced into retirement in or around December of 2015.

65.     Ms. Veres had not planned to retire for several years and has lost income for those years.

## COUNT ONE
### DISCRIMINATION
(Discrimination in the Terms, Conditions and Discharge of Employment)

66.     Ms. Veres incorporates by reference all allegations contained in paragraphs 1 through 65 of the Complaint as if more fully set forth herein.

67.     At all times relevant to this Complaint, Ms. Veres was an "employee" and the Agency was an "employer" within the meaning of the Title VII and the ADEA.

68.     The conduct as alleged throughout this Lawsuit constitutes discrimination and disparate treatment based on gender, race, age or a combination of gender, age and race in violation of Title VII and/or the ADEA.

WHEREFORE, Ms. Veres demands judgment against Defendant and seeks the following relief:

A.     Back pay, front pay and other economic damages;

B.     Compensatory damages;

       C.      Prevailing party attorneys' fees, expenses, and costs;

       D.      Injunctive relief;

       E.      Pre and Post-Judgment interest;

       F.      and such other penalties and monetary, declaratory, and equitable relief as the nature of her causes may permit.

## COUNT TWO
### HOSTILE WORK ENVIRONMENT

69.     Ms. Veres incorporates by reference all allegations contained in paragraphs 1 through 68 of the Complaint as if more fully set forth herein.

70.     At all times relevant to this Complaint, Ms. Veres was an "employee" and the Agency was an "employer" within the meaning of Title VII and the ADEA.

71.     The conduct as alleged throughout this Lawsuit constitutes unwelcome harassment on the basis of gender, race and/or age that was severe and pervasive, and that altered the conditions of her employment and created an abusive atmosphere.

72.     The Defendant knew about the hostile work environment against Ms. Veres, but failed to promptly address and remediate the harassment in question.

73.     The Defendant violated Ms. Veres's right to equal employment opportunity by allowing and failing to rectify a hostile work environment.  Ultimately, the conditions were so unbearable and that Ms. Veres was forced into retirement well before she had planned, thereby causing additional harm and damage.

WHEREFORE, Ms. Veres demands judgment against Defendant and seeks the following relief:

       A.      Back pay, front pay and other economic damages;

       B.      Compensatory damages;

C.      Prevailing party attorneys' fees, expenses, and costs;

D.      Injunctive relief;

E.      Pre and Post-Judgment interest;

F.      and such other penalties and monetary, declaratory, and equitable relief as

the nature of her causes may permit.

## DEMAND FOR TRIAL BY JURY

Ms. Veres demands a trial by jury in this action on all causes in this Lawsuit.


                                        Respectfully Submitted,


                                        _____/s/_____
                                        Timothy W. Romberger
                                        1025 Connecticut Avenue, N.W.
                                        Suite 1000
                                        Washington, D.C.  20046
                                        (202) 248-5053
                                        (703) 582-6494 Cell
                                        timromberger1@comcast.net

                                        -AND_

                                        Ruth Ann Azeredo
                                        1997 Annapolis Exchange Parkway
                                        Suite 300
                                        Annapolis, MD  21401
                                        (410) 558-1915
                                        (410) 558-1917 Fax
                                        ruthazeredo@comcast.net
                                        *To Be Admitted Pro Hac Vice*

Date:   July 29, 2019